Slip Op. No. 22-28

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MAGID GLOVE & SAFETY MANUFACTURING CO. LLC, | |
| Plaintiff, | Before: Timothy C. Stanceu, Judge |
| v. | Court No. 16-00150 |
| UNITED STATES, | |
| Defendant. | |

OPINION

[Granting defendant's cross motion for summary judgment in an action involving the tariff classification of certain imported gloves.]

Dated:  March 25, 2022

*Lawrence M. Friedman*, Barnes, Richardson & Colburn, LLP of Chicago, IL, for plaintiff.  With him on the brief were *Meaghan E. Vander Schaaf* and *Robert E. Burke*.

*Marcella Powell*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for defendant.  With her on the brief were *Aimee Lee*, Assistant Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Justin R. Miller*, Attorney-In-Charge, International Trade Field Office.  Of counsel on the brief was *Paula Smith*, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Stanceu, Judge: Plaintiff Magid Glove & Safety Manufacturing Co. LLC

("Magid") commenced this action to contest the denial of its administrative protest by

U.S. Customs and Border Protection ("Customs" or "CBP").  Magid claims that

Customs incorrectly determined the tariff classification of certain imported gloves.

Before the court are cross-motions for summary judgment.  The court awards summary

judgment in favor of defendant United States.

## I. BACKGROUND

This case involves gloves imported from the People's Republic of China and the

Republic of Korea, each of which consists of a glove-shaped "shell" knitted from man-

made fibers that, after the knitting process, is dipped in polyurethane, which forms a

flexible plastic layer covering the palm and portions of the thumb and fingers of each

glove.  Prior to the dipping process, the shell is in the shape of a complete glove, i.e., it

is knitted from yarn directly to a shape that covers the entire hand.  Mot. For Summ. J.

Ex. B, at 12–13 (Mar. 22, 2021), ECF No. 44-4 (deposition testimony of Gary Cohen dated

Oct. 2, 2020) ("Pl.'s Ex. B").

Magid was the importer of record on two entries of the merchandise, made at the

Port of Chicago in January 2015.  Following liquidation of the two entries on

November 20, 2015, Magid filed a protest of the liquidations on February 8, 2016, which

Customs denied on March 1, 2016.  Summons (Aug. 12, 2016), ECF No. 1.  Magid

initiated the instant action to contest the protest denials on August 12, 2016.  *Id.*

Magid filed a motion for summary judgment with accompanying brief on

March 22, 2021.  Mot. For Summ. J., ECF No. 44; Mem. in Supp. of Pl.'s Mot. for Summ.

J., ECF No, 44-1 ("Pl.'s Mot.").  Defendant filed a cross motion for summary judgment

and opposition to plaintiff's motion for summary judgment on June 14, 2021.  Def.'s

Cross Mot. for Summ. J., ECF No. 50; Def.'s Mem. in Supp. of its Cross Mot. for Summ.

J. and in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 50 ("Def.'s Mot.").

On July 19, 2021, plaintiff filed a response to defendant's cross motion for

summary judgment and reply to defendant's opposition to plaintiff's motion for

summary judgment.  Pl.'s Resp. to Def.'s Cross Mot. for Summ. J. and Reply to Def.'s

Opp'n to Pl.'s Mot. for Summ. J., ECF No. 51 ("Pl.'s Resp.").  Defendant replied in

support of its cross motion on September 17, 2021.  Reply Br. in Further Supp. of Def.'s

Cross Mot. for Summ. J., ECF No. 56.

## II.  DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to 28 U.S.C. § 1581(a), which provides

the Court of International Trade exclusive jurisdiction of a civil action commenced

under section 515 of the Tariff Act of 1930 ("Tariff Act"), *as amended*, 19 U.S.C. § 1515, to

contest the denial of a protest.[1]

Actions to contest the denial of a protest are adjudicated *de novo*.  *See* 28 U.S.C.

§ 2640(a)(1) (directing the Court of International Trade to "make its determinations

upon the basis of the record made before the court").  The court shall grant summary

judgment if "the movant shows that there is no genuine dispute as to any material fact

---

[1] Citations herein to the United States Code are to the 2012 edition.

and the movant is entitled to judgment as a matter of law."  CIT Rule 56(a).  In a tariff

classification dispute, summary judgment is appropriate where "there is no genuine

dispute as to the nature of the merchandise and the classification determination turns

on the proper meaning and scope of the relevant tariff provisions."  *Deckers Outdoor*

*Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (citations omitted).

### B.  Description of the Merchandise

The facts stated in this Opinion and Order as to the description of the

merchandise are not in dispute.  *See* R. 56.3 Statement of Material Facts as to which

There is No Genuine Issue to Be Tried (Mar. 22, 2021), ECF No. 44-2; Def.'s Statement of

Material Facts as to which There is No Genuine Issue to be Tried at 4 (June 14, 2021),

ECF No. 50 ("Def.'s Statement of Material Facts").

This case involves the tariff classification of eight models of gloves (models

BP169, GP150, SWGPD546, GPD546, PF540, SWGPD590, GPD590, and PU50).  Pl.'s

Mot. 3–4.  The shell of each glove is "knit to shape on an industrial knitting machine"

and is "made of man-made fibers."  *Id*. at 4.  Six of the models have shells knitted

exclusively from man-made textile fibers (variously, polyester, nylon, high-performance

polyethylene ("HPPE") lycra, tsunooga, and spandex).  *Id*.  Two models (SWGPD590

and GPD590) are made of 91% man-made textile fiber and 9% glass fiber.  *Id*.  After

being knitted to shape on the knitting machine, each shell is further processed by being

dipped in liquid polyurethane, which, as shown by the samples provided to the court,

has solidified into a flexible plastic coating that covers the palms and portions of the

fingers and thumb.[2]  *Id*. at 4–5; samples.  The gloves are "specially designed and

marketed for use in the automotive, metal stamping, and other industrial and

commercial settings."  Pl.'s Mot. at 6.

## C.  Tariff Classification under the HTSUS

Tariff classification under the Harmonized Tariff Schedule of the United States

("HTSUS") is governed by the General Rules of Interpretation ("GRIs"), and, if

applicable, the Additional U.S. Rules of Interpretation, both of which are part of the

legal text of the HTSUS.  The GRIs are applied in numerical order, with GRI 1 providing

that "classification shall be determined according to the terms of the headings and any

relative Section or Chapter Notes."  GRI 1, HTSUS.  GRIs 2 through 5 apply "provided

such headings or notes do not otherwise require."  *Id*.  After determining the correct

heading, a court determines the correct subheading according to GRI 6, HTSUS

---

[2] While plaintiff indicates that model BP 169 varies from the other models in being coated with a mixture of 75% polyester and 25% polyurethane, Mem. in Supp. of Pl.'s Mot. for Summ. J. at 4 (Mar. 22, 2021), ECF No. 44-1 ("Pl.'s Mot."), other of plaintiff's statements of fact inform the court that the coating on model BP 169 consists of 100% polyurethane.  *Id*. at 3 (indicating that coating on model BP 169 is polyurethane); Mot. for Summ. J. Ex. A, at A002 (Mar. 22, 2021), ECF No. 44-3 (product specification sheet for BP169 describing the product as being composed of "100% polyester shell; 100% polyurethane palm coating").  The court considers each model at issue to have been dipped solely in polyurethane.  Pl.'s Mot at 4–5 ("The glove then moves to a 'dipping line' where the gloves are dipped in liquid polyurethane.") (citation omitted).  However, even if model BP 169 varied from the others in being coated with a mixture of 75% polyester and 25% polyurethane, that difference would have no bearing on the court's classification analysis.

(directing determination of the subheading according to the terms of the subheadings and any related subheading notes, and GRIs 1-5 as applied at the subheading level, *mutatis mutandis*); *see Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998).

"Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings." *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).  When interpreting the HTSUS, the court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Carl Zeiss*, 195 F.3d at 1379 (citing *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999)).

The court also consults the Explanatory Notes ("ENs") for the Harmonized Commodity Description and Coding System ("Harmonized System" or "HS") maintained by the World Customs Organization.  Although not legally binding, the ENs "are generally indicative of the proper interpretation of a tariff provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).  HTSUS provisions are based on the Harmonized System rules and nomenclature (pursuant to the Harmonized System Convention) with respect to the GRIs, the section and chapter notes, and the headings and subheadings to the six-digit level.  Therefore, the Explanatory Notes are

informative as to the intent of the drafters of the Harmonized System where, as here,

the dispute involves a legal determination of the scope of the competing headings as

determined under the GRIs and the section and chapter notes.

In cases involving a tariff classification dispute, the court first considers whether

"the government's classification is correct, both independently and in comparison with

the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir.

1984). Plaintiff has the burden of showing that the government's determined

classification is incorrect. *Id.* at 876. If plaintiff meets that burden, the court has an

independent duty to arrive at "the correct result, by whatever procedure is best suited

to the case at hand." *Id.* at 878.

### D.  Claims of the Parties

Upon liquidation, Customs classified the imported articles in subheading

6116.10.55, HTSUS ("Gloves, mittens and mitts, knitted or crocheted: Impregnated,

coated or covered with plastics or rubber: . . . Other: Without fourchettes: . . . Other:

Containing 50 percent or more by weight of cotton, man-made fibers or other textile

fibers, or any combination thereof"), subject to duty at 13.2% *ad valorem*.[3] Summons 2.

Plaintiff claims classification in subheading 3926.20.10, HTSUS ("Other articles of

plastics and articles of other materials of headings 3901 to 3914: . . . Articles of apparel

---

[3] Because the entries of the merchandise at issue occurred in 2015, citations
herein to the Harmonized Tariff Schedule of the United States ("HTSUS") are to the
2015 version.

and clothing accessories (including gloves, mittens and mitts): . . . Gloves, mittens and

mitts: Seamless"), free of duty.  Pl.'s Mot. 7–9.

Defendant claims that the classification determined by Customs upon liquidation

is correct.  Def.'s Mot. 1.

### E.  Application of GRI 1, HTSUS to Determine the Appropriate Heading

The candidate headings of the HTSUS identified by the parties, in numerical

order and presented with the respective article descriptions, are as follows:

| | |
|---|---|
| Heading 3926 | "Other articles of plastics and articles of other materials of headings 3901 to 3914" |
| Heading 6116 | "Gloves, mittens and mitts, knitted or crocheted" |

The court has identified no other candidate headings.[4]

For purposes of GRI 1, the terms of heading 3926 do not describe Magid's

imported gloves because, while comprised in part of a plastic material (polyurethane),

the gloves are not "of plastics" or of other materials of headings 3901 to 3914 (which

pertain to various plastics and similar substances in primary forms).  Also, note 2(p) to

---

[4] The court concludes that the presence of 9% glass fiber in the shells of models SWGPD590 and GPD590 is insufficient to result in classification in a heading of chapter 70, Glass and Glassware (a classification neither party argues).  An examination of a sample of model GPD590 and the presence of 91% textile fiber content cause the court to conclude that these gloves do not have the character of articles of glass fiber. *See* n. 1(r) to sec. XI, HTSUS (excluding from section XI "[g]lass fibers or articles of glass fibers . . ."); *see also* EN(d) to sec. XI (explaining that the exclusion from Section XI applies also to "composite articles made of glass fibres and textile fibres having the character of articles of glass fibres (Chapter 70)").

chapter 39, HTSUS excludes from that chapter "[g]oods of section XI (textile and textile articles)."

The article description for heading 6116, HTSUS, "Gloves, . . .  knitted," describes the merchandise at issue.  *See* Pl.'s Mot. 4 ("The *knit gloves* are made of man-made fibers" and "are *knit to shape* on an industrial knitting machine.") (citations omitted) (emphases added).  Plaintiff disagrees that a term of heading 6116 is descriptive of its gloves: "A simple examination of the samples submitted to the Court shows that the Government's position ignores that the knitted textile component of Heading 6116 only describes a portion of the glove."  Pl.'s Resp. 11.  According to Magid, "[t]his coating is a critical component of the gloves and distinguishes the gloves from uncoated textile gloves encompassed by Heading 6116," and "[a]s the gloves are composed of two or more materials, they cannot be classified under GRI 1."  *Id*.

The issue presented by plaintiff's argument is whether the presence of the plastic coating on the palm and portions of the fingers and thumb of each glove is sufficient, *per se*, to exclude these articles from heading 6116, HTSUS.  Relevant to that question is an Explanatory Note to chapter 61, as follows:

> The classification of goods in this Chapter [61] is not affected by the presence of parts or accessories of, for example, woven fabrics, furskin, feathers, leather, plastics or metal.  Where, however, the presence of these materials constitutes **more than mere trimming** the articles are classified in accordance with the relative Chapter Notes (particularly Note 4 to Chapter 43 and Note 2(b) to Chapter 67, relating to the presence of furskin and feathers, respectively), or failing that, according to the General Interpretive Rules.

General EN to ch. 61.  It is uncontested that the plastic coating is not mere trimming.  It

covers a significant portion of the glove and adds functional characteristics.  *See* Pl.'s

Mot. 5–6 & documents cited therein.  Were it mere trimming, that fact would be

conclusive in requiring classification under heading 6116, HTSUS.  But the fact that it is

not mere trimming does not conclusively establish the opposite, i.e., that the gloves at

issue are *not* classified in heading 6116; it means only that the court should look to the

relative chapter notes and the GRIs to resolve the issue of whether the plastic coating

excludes the gloves from the intended scope of heading 6116.  The court finds no other

relative chapter notes and proceeds to apply the GRIs to resolve the question presented.

The importance GRI 1 attaches to the terms of the headings provides the answer.

       The General Explanatory Note to Chapter 61 applies generally to the goods of

the chapter, whereas another Explanatory Note is exclusive to gloves.  Explanatory

Note 61.16, which the court views as indicative of the intent of the drafters of the

Harmonized System as to the meaning of the terms of HS heading 61.16, instructs that

"[t]his heading covers *all* knitted or crocheted gloves . . ."  EN 61.16 (emphasis added).

Even more significant, this Explanatory Note contemplates that knitted or crocheted

gloves to which non-knitted components have been attached still would be described

by the common and commercial term "knitted or crocheted gloves," within the

meaning of that term as used by the drafters of the Harmonized System.  *See id*.

(instructing that the heading excludes "*[k]nitted* or crocheted *gloves*, mittens and mitts

lined with furskin or artificial fur, or with furskin or artificial fur on the outside (**other than** as mere trimming) (**heading 43.03** [. . . 'articles of furskin'] **or 43.04** ['artificial fur and articles thereof'])") (emphasis added).  The court reasonably may infer from the wording of this exclusion that a glove can have as a component on the outside surface or the lining a material that is not a knitted material yet still be described by the general term "knitted glove."  Moreover, in expressly excluding from the scope of the heading knitted gloves with attached furskin or artificial fur that is not mere trimming, the note does not similarly exclude knitted gloves that have been impregnated or coated with a layer of plastic, whether or not the layer is present as mere trimming.  In all these respects, EN 61.16 evidences an intent on the part of the HS drafters that the heading term "Gloves, . . . knitted or crocheted" includes as a general matter those to which a non-knitted component, such as a plastic layer, has been affixed, even if that non-knitted component is more than mere trimming.  In summary, the subject gloves are described by the term of heading 6116, "Gloves, . . . knitted" for purposes of GRI 1 and, therefore, fall within the scope of that heading of the HTSUS.

GRI 1 gives equal priority to the terms of the headings and "any relative Section or Chapter Notes."  GRI 1, HTSUS.  In that respect, plaintiff argues that the scope of heading 6116, which is located within section XI, HTSUS, is limited so as to exclude its imported gloves.  According to Magid, "Section XI, Note 1(h) expressly excludes from that Section 'woven, knitted or crocheted fabrics, felt or nonwovens, **impregnated,**

**coated, covered** or laminated with plastics, or articles thereof' (emphasis added) and

indicates that they are to be classified in Chapter 39." Pl.'s Mot. 16. The court

disagrees.

Plaintiff's paraphrase of note 1(h) to section XI, HTSUS misquotes and

misinterprets the text. The actual text is as follows: "This section does not cover . . .

Woven, knitted or crocheted fabrics, felt or nonwovens, impregnated, coated, covered

or laminated with plastics, or articles thereof, *of chapter 39*." N. 1(h) to sec. XI, HTSUS

(emphasis added).

As signified by the overall context and the placement of the comma following the

word "thereof," the prepositional phrase "of chapter 39" modifies and limits the term

"[w]oven, knitted or crocheted fabrics . . . impregnated, coated, covered or laminated

with plastics" (as well as the term "articles thereof"). According to its express terms,

and as applied to the facts of this case, note 1(h) to section XI, HTSUS would exclude the

gloves at issue from heading 6116, HTSUS only if they are "articles" *of* "knitted . . .

fabrics . . . impregnated, coated, covered or laminated . . . with plastics," and only if

those fabrics are classified within chapter 39, HTSUS. As discussed below, the court

concludes that the gloves in question are not such articles.

A heading within Chapter 39, HTSUS would include within its scope some

products in the form of sheets or film that are combinations of plastics and textiles and

that could be described as "fabrics." Heading 3920 thereof includes plastics in the form

of sheets or film that are "not reinforced, laminated, supported or similarly combined

with other materials," and, in contrast, the subsequent heading, heading 3921,

encompasses products in sheet (or film) form that *are* combinations of plastics and other

materials.[5]  *See* heading 3921, HTSUS ("*Other* plates, sheets, film, foil and strip, of

plastics"); *see also* EN 39.21 ("This heading covers plates, sheets, film, foil and strip, of

plastics **other than** those of heading . . . 39.20.").  By its terms, heading 3921, HTSUS

includes some plastic sheet or film products that have a textile component and could be

described as "fabrics."  But the HTSUS treats this limited class of goods as plastic sheet

or film, despite the presence of a textile component, rather than as "textiles" or "textile

fabrics," which, as a general matter, are not within the scope of chapter 39, even if

containing a component of plastic.  *See* n. 2(p) to ch. 39, HTSUS (excluding from

chapter 39 "[g]oods of section XI (textiles and textile articles)."[6]

---

[5] Two other headings within chapter 39, HTSUS include rolls or sheets but are
not pertinent here.  Heading 3918, HTSUS includes plastic coverings for floors (whether
or not self-adhesive) and plastic coverings for walls and ceilings, and heading 3919,
HTSUS covers other plastic self-adhesive products.  Therefore, heading 3921 is the only
heading of chapter 39, HTSUS that could include a plastic-textile combination relevant
to a classification analysis for the merchandise at issue in this litigation.

[6] *See also* n. 1 to ch. 59, HTSUS (instructing that "[e]xcept where the context
otherwise requires, for the purposes of this chapter [59] the expression 'textile fabrics'
applies only to the woven fabrics of chapters 50 to 55 and headings 5803 and 5806, the
braids and ornamental trimmings in the piece of heading 5808 and the knitted or
crocheted fabrics of headings 6002 to 6006.").  In contrast, certain fabrics that are
combinations of plastic and textile components are classified within chapter 39 rather
than as "textile fabrics" of chapter 59; these expressly are excluded from the scope of
(continued . . .)

Thus, the question presented by note 1(h) to section XI, HTSUS is whether the

gloves at issue can be described as "articles" of "knitted . . . fabrics . . . impregnated,

coated, covered or laminated with plastics" [in this case, polyurethane], of chapter 39.

N. 1(h) to sec. XI, HTSUS.  Note 1(h) would appear to exclude from the scope of

heading 6116, HTSUS gloves that were made up of a pre-existing fabric of heading 3921,

e.g., gloves that were cut from such a fabric and subsequently assembled into complete

gloves.  That, of course, is not the merchandise at issue in this case.  Here, the

unfinished glove is dipped in polyurethane *after* the completion of the knitting process.

This case, therefore, presents an issue of statutory interpretation: Is note 1(h) to

section XI, HTSUS properly interpreted more broadly to encompass, as well, a knitted

glove that was "impregnated, coated, covered or laminated" with plastic *after* the

knitting process of the article was complete?

Note 1(h) to section XI, HTSUS applies both to fabrics and to articles of those

fabrics.  To accept plaintiff's interpretation of note 1(h) to section XI, HTSUS, the court

would need to interpret the note to exclude from section XI even those articles, such as

the gloves at issue, that were not produced from a pre-existing knitted fabric (and, in

particular, not produced from a plastic sheet containing a knitted textile component, of

---

(. . . continued)
heading 5903, HTSUS ("Textile fabrics impregnated, coated, covered or laminated with
plastics, other than those of heading 5902 ["tire cord fabric . . ."]).  *See* n. 2(a) to ch. 59,
HTSUS.

heading 3921, HTSUS) but instead were knitted directly from yarn to the form of an

unfinished glove.  According to plaintiff:

> The knit gloves are made of man-made fibers. . . . The gloves have
> closed fingertips and no seams. . . . The textile component of the glove is
> complete when it comes off the machine. . . . Once the glove comes out of
> the knitting machine, it is put on a 'former,' which is shaped like a human
> hand. . . . The glove then moves to a 'dipping line' where the gloves are
> dipped in liquid polyurethane.

Pl.'s Mot. 4–5.  *See* Pl.'s Ex. B, at 12 (describing the computer-controlled knitting process

producing the finished shell directly from yarn.)

By the time the knitting process for one of Magid's gloves was complete, the

result was no longer a product that could be described as a "fabric," i.e., a material, and

had become an article, i.e., a glove-shaped shell.  Even so, plaintiff's interpretation of

note 1(h) to section XI, HTSUS is not implausible when the note is read in isolation.

Note 1(h) arguably could be construed broadly to apply even to articles, such as gloves,

to which a plastic coating is applied *after* the article is knitted, in the sense that the

plastic is applied to a portion of the knitted article that could be considered to be

"fabric" of the glove.  Under such a reading, the finished, coated glove arguably could

qualify as an article "of" a knitted "fabric" that has been coated with plastic at the end

of the manufacturing process.  Nevertheless, the court concludes that this broader

interpretation of note 1(h) cannot be correct.

GRI 1 requires consideration of all "relative" section and chapter notes.  The

knitted "fabrics" that fall within chapter 39, HTSUS and that, therefore, could be

described by note 1(h) to section XI are expressly limited by note 10 to chapter 39,

HTSUS, and the court may not consider the former without also considering the latter.

Under note 10 to chapter 39, HTSUS, the knitted fabrics must be in uncut or basic

rectangular form and thus cannot be in more complex shapes.  Specifically, the note

provides that "[i]n headings 3920 and 3921, the expression '<u>plates, sheets, film, foil and

strip</u>' applies only to plates, sheets, film, foil and strip (other than those of chapter 54)

and to blocks of regular geometric shape, whether or not printed or otherwise surface-

worked, uncut or cut into rectangles (including squares) but not further worked (even if

when so cut they become articles ready for use)."[7]  N. 10 to ch. 39, HTSUS; *see* EN 39.21

("According to Note 10 to this Chapter, the expression 'plates, sheets, film, foil and

strip' applies only to plates, sheets, film, foil and strip and to blocks of regular

geometric shape, whether or not printed or otherwise surface-worked (for example,

polished, embossed, coloured, merely curved or corrugated), uncut or cut into

rectangles (including squares) but not further worked (even if when so cut they become

articles ready for use).").

     In summary, the knitted "fabrics" described by note 1(h) to section XI, in order to

be considered fabrics of chapter 39, not only must be "impregnated, coated, covered or

laminated with plastics," they also must be in basic uncut or rectangular form.  An

---

[7] The reference to "chapter 54," which in headings 5407 and 5408 include only
woven, not knitted, fabrics, is not relevant here.

article knitted directly from yarn to an advanced shape such as a glove cannot correctly

be said to be of such a fabric.  Because "[t]he textile component of the glove is complete

when it comes off the [knitting] machine," Pl.'s Mot. 4 (citation omitted), Magid's gloves

are not "of" a fabric of chapter 39, and note 1(h) to section XI, HTSUS does not exclude

them from the scope of heading 6116, HTSUS.  Plaintiff's reliance on note 1(h) to

section XI, HTSUS to support its classification position is, therefore, misplaced.

In arguing that its gloves were classified incorrectly by Customs under heading

6116, HTSUS, Magid also argues that "[t]he gloves are *prima facie* classifiable in two

Headings: 3926 ('Other articles of plastics . . .') and 6116 ('Gloves, mittens and mitts,

knitted or crocheted')."  Pl.'s Mot. 11–12.  Plaintiff's analysis then applies GRIs 2(b) and

3(b) to conclude, for purposes of GRI 2(b), that "each Heading references a material or

substance—knitted or crocheted textiles of 6116 and plastics of 3926—and must be

taken to include a ref[er]ence to combinations of that material with other materials."  *Id*.

Then, relying on the directive in GRI 2(b) that "[t]he classification of goods consisting of

more than one material or substance shall be according to the principles of rule 3,"

plaintiff argues that the gloves are "composite goods" within the meaning of GRI 3(b)

and must be classified thereunder "as if they consisted of the material or component

which gives them their essential character, insofar as this criterion is applicable."  *Id*. at

12–13 (quoting GRIs 2(b) and 3(b), HTSUS).  Magid views the essential character as

imparted by the layer of plastic (i.e., the polyurethane resulting from the dipping

process), resulting in classification within chapter 39, and specifically in heading 3926,

HTSUS as an article of plastic.

In directing that classification is determined according to the terms of the

headings and any relative section and chapter notes, GRI 1 allows application of GRIs 2

through 5 only "provided such headings or notes *do not otherwise require*."  GRI 1,

HTSUS (emphasis added).  Here, the terms of the competing headings *do* otherwise

require.  Because a term within the article description for heading 6116, HTSUS

describes the gloves at issue in this litigation, because these gloves are not described by

a term within the competing heading 3926, HTSUS, because no other heading merits

consideration, and because no section or chapter note of the HTSUS requires otherwise,

heading 6116, HTSUS is the correct heading by operation of GRI 1.  And because GRIs 2

through 5 apply only if the terms of the headings and the relative section and chapter

notes do not otherwise require, plaintiff's contrary argument that classification should

be determined according to GRI 3(b) based on "essential character" is not correct.

### F.  Application of GRI 6, HTSUS to Determine the Correct Subheading

The uncontested facts readily allow the court to determine, pursuant to GRI 6,

the correct subheading of heading 6116, HTSUS for the classification of the merchandise

at issue in this case.

Within heading 6116, HTSUS, subheading 6116.10 carries the article description "[Gloves, . . . knitted or crocheted:] . . . Impregnated, coated or covered with plastics or rubber."  This subheading describes the gloves at issue.

Within the six-digit subheading, subheadings 6116.10.05 and 6116.10.08, HTSUS, respectively, are not applicable because the gloves are not hockey gloves and are not otherwise "specially designed for use in sports."

The parties agree that the gloves at issue do not have fourchettes, which, plaintiff explains, are strips or shaped pieces used for the sides of the fingers of a glove.  Pl.'s Mot. 4 (quoting *What Every Member of the Trade Community Should Know About: Gloves, Mittens & Mitts, Not Knitted or Crocheted, Under the HTSUS* at 8 (CBP 2008)).  Because they lack fourchettes, and because these gloves are not "[c]ut and sewn from preexisting machine-knit fabric . . . ," subheadings 6116.10.13–6116.10.48, HTSUS are eliminated from consideration.

Therefore, the correct subheading is as determined by Customs upon liquidation: subheading 6116.10.55, HTSUS ("Gloves, mittens and mitts, knitted or crocheted: Impregnated, coated or covered with plastics or rubber: . . . Other: Without fourchettes: . . . Other: Containing 50 percent or more by weight of cotton, man-made fibers or other textile fibers, or any combination thereof"), subject to duty at 13.2% *ad valorem*.

### III. CONCLUSION

For the reasons stated above, the court rules that plaintiff has not demonstrated that "the government's classification is incorrect." *Jarvis Clark*, 733 F.2d at 876. Accordingly, the court will deny plaintiff's motion for summary judgment, grant defendant's cross motion, and enter summary judgment in favor of defendant.

/s/ Timothy C. Stanceu

Timothy C. Stanceu, Judge

Dated: March 25, 2022
        New York, New York